All right, our final case for this morning is United States v. Matthew Higgins-Vogt. Mr. Bruno. Good morning, Your Honors. Thank you. May it please the Court, Counsel. I'm Evan Bruno. I'm appointed to represent Mr. Higgins-Vogt. This case is up before the Court today on a conditional guilty plea in which Mr. Higgins-Vogt reserved the right to appeal the District Court's denial of his motion to suppress his statements and the proofs thereof. Our position can proceed on basically three main points. Number one, Sharon K. Brown had no business and no qualifications providing mental health treatment to anybody, much less inmates who are awaiting trial for crimes for which they're presumed innocent in a county jail. Second, the government knew who Sharon K. Brown was, knew her background, knew her lack of qualifications, and the government put Sharon Brown in the Macon County Jail to provide mental health counseling to inmates who were awaiting trial for crimes for which they're presumed innocent and for which they have constitutional rights. Very important constitutional rights regarding statements that they make to government entities. The government put her there knowing who she was, what her background was. Now, doesn't Brown at some point say that she regarded part of her job to encourage people to relieve their consciences and come clean and talk to the police? She does, Your Honor. She says, describing her role at the jail, so her title is Senior Law Enforcement Counselor. And she's got the office there. She's a contract employee. She's a contract employee, which I think the government of the District Court, not to get off to that side issue, but made a bigger deal of the fact that her employer was Heritage, even though she worked for a contract for the jail. She described her job. Her goal with all the inmates that she worked with was for them to gain empathy, this is a quote, quote, for them to gain empathy so they can feel what their victims felt, end quote. And she explained, quote, somewhere along the line, in order to become incarcerated, you've made a victim, end quote. When asked, she said, yes, I take that approach to inmates, defendants awaiting trial, presumed innocent. She testified, quote, when an inmate, whether it be the defendant or anyone else, starts telling me details of things that they have already talked to a cop of some sort, I encourage them to continue to talk to the cop. It's not my job to listen to crimes and the details of crimes and hold that in for months. So Ms. Brown has a bachelor's degree, an undergraduate degree in psychology from the University of Illinois from the 80s. She is a career corrections worker. She has no license to perform mental health treatment. She has no training to perform mental health treatment. But why does that matter to the voluntariness of Mr. Higgins' vote's confession? I mean, that's really what we're focused on. Exactly. She could be, you know, somebody with, you know, a medieval history background, but if it doesn't affect the voluntariness one way or the other, we don't care. The third point of our argument is that it did matter. Were it not for her, quote, unquote, counseling of the defendant, he would not have made that confession. Mr. Bruno, in making that argument, can you focus in particular on the May 27th statement? The final one. Yeah, I'll tell you. I think that's the most difficult issue for Mr. Higgins' void because it sure looks to me, and you should correct me if I've read this wrong, that he actually affirmatively tracks down the authorities through the prison guard, saying he wants to make a statement. And he actually writes it on some note card or something. And this seems to follow some discussion that was of moment to him with his girlfriend. So Ms. Brown, even acknowledging the troubling aspects that you were highlighting earlier, is really not part of the story with respect to May 27th. Am I reading that right or wrong? Your Honor, I would disagree with the characterization of her not as part of the story. I believe she certainly did have a key role in getting him from a point of I ain't saying anything to I want to make a confession. No, that's fair enough. But on the 27th, he seems to be almost whistling down a guard saying I want to confess to a murder. So he came to the pod door, testimony from the guard, John Mayers, that he's in tears. He says, I want to confess to the murder of Paige Mars. Right, right. Then Officer Mayer, his first person he goes to find is Sharon Brown to connect Brown and the defendant together. And then the defendant proceeds to have this recorded interview with Brown present. That was the second interview where he made the full confession to the murder. His girlfriend, Amy Ward, who he spoke with on the phone, there is some testimony or the recording of the jailhouse phone call. Ward says something to the effect if you did this. All right. How does that all not just indicate this is an act of his own volition? All of that combined. And I could just throw in, isn't the test the totality of the circumstances anyway? So, I mean, each one of these details plays a part. It is, Your Honor. We are operating under the totality framework. We see the case different from the way the government, the way the district court saw the case. It's our position that the counseling provided by Brown was more impactful than what the government or the district court believes. But we normally defer to those kinds of factual assessments. That's correct, Your Honor. We proceed under the clearly erroneous standard here. We understand, I would agree, that this is not a slam dunk in terms of proving that the sole or the defendant, his voluntariness about whether Brown's counseling overcame his will is obviously the key issue here before us today. A few things in support of our contention that it was Brown who was the primary agent in overcoming his will. There's a few things. Brown repeatedly, several points in the record, says she did encourage him to speak to police. Brown was the, at least from Mr. Higgins' vote's point of view, she was the person he should listen to in terms of what's the right thing for him to do, what's the right thing for him to do for his mental health, how do I make this situation right? But you know, I mean, the district court points out, I don't think it's an unmixed record because Brown encourages him to talk about gangs, Brown prods him sometimes. But on the other hand, Brown knows for more than a month that he killed Mars and she maintains confidentiality. So it's at best a mixed record for you. And in fact, there are indicators that she really was fulfilling the role of the counselor. Well, I would agree that it's mixed if you look at what Brown did. All the evidence in the record about what was her objective, how did she carry it out, you can see it both ways in some points. We think the lion's share of the evidence supports the fact that she was acting, not necessarily by appointment or designation from the detectives, but she was acting on her own with a purpose towards aiding the truth-seeking function that's normally reserved for law enforcement. And I think the government and the district court have kind of taken the side of form over substance here, focusing on things like Detective Joe Patton never asked her to get this information. She was employed by heritage and not by law enforcement directly. I think that's form over substance. I think she clearly, based on everything, was acting as an agent for law enforcement. I see my time is up. Thank you. All right. Thank you. Ms. Boyle. May it please the Court, my name is Catherine Boyle on behalf of the United States. Your Honors, Matthew Higgins' vote shot Paige Mars five times, execution style, by the river indicator. Afterwards, he was overwhelmed with guilt, and he gave full and partial confessions. He repeatedly told his friends, his family, law enforcement, and his counselor that he couldn't live with having committed that brutal murder. Only later did he bring up the idea of counselor coercion, and he now challenges the confession as involuntary. But the totality of the circumstances here clearly show that the confession was voluntary. First, the counselor, Sharon Brown, did not act as an agent of law enforcement, and therefore she couldn't have committed police coercion. So I actually think that's your weakest point, because I think there are many indications that she was, in fact, acting as an agent of law enforcement. But that's, of course, not the end of the discussion. That's maybe the beginning of the discussion, because it's totality of the circumstances and the length of time between when he confesses to her and when he finally decides to come clean is actually quite long, if you want to think of cases like Missouri against Seabird or other sorts of things. But I would be very uncomfortable saying that somebody who is in the jail, who sees her duty is to encourage people to go talk to the police, who's playing this faux friend role, isn't somehow a law enforcement agent. And my bet is that if she knew something exculpatory, she'd be included under Brady even. But anyway, I'm concerned about that aspect of your theory, which does not necessarily mean the bottom line, but that aspect. I understand, Your Honor. And I think if you look at the McAllister factors to start out with, whether the government acquiesced and agreed with the counselor's conduct first of all, which here clearly they did not. Detective Patton said he had never talked to the Sharon Brown about any of his cases. He hadn't talked to her about this case in particular. Next, if you look at what her purpose was, she's repeatedly stated her purpose was to help inmates heal, help them find peace. But healing, she's ambiguous about that. It reminds me a little bit of one of our other cases, because on the one hand, healing means you made a victim. Well, that suggests that she thinks they're in there because they committed a crime. She doesn't think they're in there because they've been accused of committing a crime but might be innocent. So her goal is partly to get them to admit that they committed the crime. Maybe it's to make them feel better too or to empathize with the victim or what have you. But it's a messier situation. Well, Your Honor, I'm not sure if that's the entire picture. She also does say she didn't want any of the inmates to talk to her about their crime. She preferred that they talked. She said, I know as defense counsel noted, she did mention at one point talking to law enforcement, but she also mentioned talking to their attorney. And when Mr. Higgins first came to her, he said he was freaking out. He came in and he tried to start telling her about it, and she tried to stop him. Right, and she tries to stop him. What would it do to your case if we thought that she was, at least for limited purposes, an agent of the state? Does that mean the confession is involuntary? No, Your Honor. For the sake of argument, I don't think the confession would be involuntary in that case. I think if you look at the totality of the circumstances here, the confession still is voluntary. I think one of the first things you're going to look at would be the number of statements Mr. Higgins made indicating that this confession was the product of overwhelming guilt. From that first April 16th interview with Sharon Brown where he says to her, I just have to get this off my chest, even as she's trying to stop him from talking. Well, what about, just to interrupt for a moment, Miranda and the right to counsel, apart from the voluntariness issue? We're post-charging. He's got an attorney. Yes, Your Honor. They're having all these counseling sessions. Yes, Your Honor, and to the extent that we're discussing a Sixth Amendment issue, I think that's something. The term Sixth Amendment is never brought up in the defendant's brief. Well, what about Miranda? Part of the argument is Miranda. She didn't preface any of her counseling sessions with Miranda warnings because they weren't considered to be custodial interrogations. But if she's an agent of the state, does that change the character of these sessions such that Miranda warnings were required, which is part of the argument that's being made, I think. Yes, Your Honor, I think that is part of the argument being made. We would argue that even if a Miranda warning had been required for some reason for these counseling sessions, that the later law enforcement interviews weren't tainted by that lack of a Miranda warning due to the increase in time in between, the fact that there was a change in the person having the interview. While Sharon Brown was present, it wasn't Mr. Higgins' vote to request, and Detective Patton was actually the one conducting the interviews there. I think both of these things distinguish that situation from the case counsel brought out in Missouri v. Siebert, and I think that Well, we also have case law post-Siebert saying that unless the first interrogations involve a deliberate withholding of Miranda warnings, then there's no taint. Yes. Yes, Your Honor. So I think that would help our case as well. I don't think Sharon Brown thought she was obligated to give Miranda in this case. She's actually said she didn't believe she was obligated to give clients Miranda warnings, and she has said that she considered their communications confidential. Something else I think is interesting to look at in the context of this line of questioning is Sharon Brown's participation in the law enforcement interviews and what was said before she really interjected anything of substance. And when you look at the May 20th interview, you have Mr. Higgins' vote already stating the location of the murder weapon and claiming that Kelton Snyder had committed the crime, which she remained silent for. She remained silent for the month in between April 16th and May 20th, but she also didn't contradict him during the interview when he said Kelton Snyder was the one who had actually committed the murder. She remained silent for the week following through May 27th. Your Honor, I think your point was well taken that every indication of the May 27th interview is that he had a meeting with his girlfriend. She told him he needed to take responsibility if he had committed such a horrible crime. He called a correctional officer who had never had any interaction with him about his case before and in fact said he didn't really know anything about the case, said, I want to confess to the murder of Paige Mars. He was given the inmate request form. He then wrote, I want to confess to the murder of Paige Mars, which really seems to me to be he initiated that contact. It seems to be a voluntary statement. It wasn't in response to any questioning, and I think it's consistent. Defense counsel pointed out here that the CO then called Sharon Brown because he was in tears. That seems pretty consistent. I think during the suppression hearings, some testimony came out where they said every time an inmate sort of started yelling or crying, they kind of called Sharon Brown because I think that they thought with her mental health background she was the most appropriate person to deal with that. And then also the correctional officer additionally contacted Sergeant Reynolds to contact Detective Patton. He didn't just contact Sharon Brown. And then if you look at the May 27th interview itself, the defendant first says, I think in the first minute, he says, I want to confess to the murder of Paige Mars, again before Sharon Brown really says anything of substance in that interview. In some of those interviews, there are reminders. You've gotten Miranda warnings in the past. Yes, Your Honor. They remind you you've had the right to counsel. You know your rights. He affirms that he knows his rights. And in fact, every single one of these encounters with Sharon Brown, he and the defendant initiates them. He asks for the session with her. My understanding is there were about six encounters, and he typically requested to meet with her during those times, which I think also goes to an important point about whether she's obligated to give Miranda, because was he really in custody during these interviews with Sharon Brown? He initiates. It's in her counselor's office. Presumably he can terminate at any time. Does it really have the goal of prosecution in mind if she thinks all of these things are confidential? And by her actions, they really did remain confidential until he told law enforcement. It's kind of odd that a counselor in a jail, a pretrial detention facility like this, would not be subject to some very rigorous protocols about what is off limits to discuss with inmates, like their cases. Yes, Your Honor. My understanding is she really was under the supervision, and this again goes to the analysis of whether she is an agent of law enforcement. She really was under the supervision of Heritage. I don't think at Macon County they felt like they had any right to go in and tell her how to do her job or request that she try to list information. But that's where it's really dangerous for her to be roving the facility, pledging confidentiality to inmates, and then pivoting and saying, well, now that you've told me things like this, I can't keep them to myself. I think you need to talk to the police department. I mean, the stakes are awfully high for the people that take her at her word on the confidentiality. Yes, Your Honor, although I do think there are indications that she did preserve the confidentiality. But only partially. I mean, she inserts into the conversation facts that she's learned, such as the gang comment, just out of the blue. She initiates that, hey, tell them about the gangs, too. And so she's not really 100% At the May 20th, didn't she say something about, tell them about the ammunition, where you got the ammunition from, I think referring to the murder. She does, Your Honor. And I would just point out sort of for the sake of the cleanness of the interview, that did come after he had already identified the murder weapon and identified Mr. Snyder as the murderer. But if Mr. Snyder was the murderer, why is she prompting him on the ammunition? It just shows that the line is not a clear one. Yes, Your Honor. I would also point out that at the May 20th interview, I'm sorry, Your Honor, I lost my train of thought. But, yes, I understand what you're saying. I think most of the statements that were concerning came prior to her interjections in the May 20th interview, though. Okay. Well, I think that's it. So thank you very much. And, Mr. Bruno, you have about a minute left. Thank you. Thank you, Your Honor. Briefly, I agree with the sentiment from Your Honors that this was very tricky and kind of a dangerous situation in the Macon County Jail. It's a very big county jail, and most of the federal inmates from the central district or bandit division are housed in that jail. Brown was called upon by jail personnel. This is according to the testimony of John Mayer, a correctional officer. The correctional officers employed by the Sheriff's Department would call upon Brown to come talk to inmates about cases. Brown testified when describing things she'd talk about. She said she'd talk about things like arrest, charging, arraignment, bond, preliminary hearing, obtaining an attorney, pretrials, trials, pleas, sentencing, probation, and prison. These are discussions she'd have with inmates who are awaiting trial who have attorneys. Last thing, I just want to mention Miranda because those eight minutes went by fast. I think this is a Miranda violation. If it had been Detective Joe Patton, who had walked from the police station down to the jail and talked to Mr. Higgins about, you know, without Miranda, but just talked to him about the pros and cons of coming clean and done that several times, and then Mr. Higgins' vote would have, on May 27th, decided to make a confession, I think we'd have a much different case, at least the way the government would view it. And I think Sharon Brown should be treated exactly like that, as if she were on the team with the other detectives. Thank you, Your Honors. All right. Thank you very much, and thank you for accepting the appointment in this case. It's great help to the court and to your client. Thanks as well to the government. We'll take the case under advisement, and the court will be in recess.